## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| RAJA VADAPALLY; | |
| SWETHA BACHU; | |
| PRUDHIVI RAJ GUNDABATHULA; | |
| RAJASEKHAR REDDY PASAM,<br>Individually and on Behalf of All Others<br>Similarly Situated; | Case No. |
| Plaintiffs,<br>v. | |
| PATRICK LECHLEITNER,<br>In his official capacity as Director of U.S.<br>Immigration and Customs Enforcement; | CLASS ACTION COMPLAINT FOR<br>DECLARATORY AND INJUNCTIVE<br>RELIEF |
| ALEJANDRO MAYORKAS,<br>In his official capacity as Secretary of the U.S<br>Department of Homeland Security; | |
| UR MENDOZA JADDOU,<br>In her Official Capacity as Director of U.S.<br>Citizenship and Immigration Services; | |
| THE U.S. DEPARTMENT OF HOMELAND<br>SECURITY ("DHS"); | |
| THE UNITED STATES DEPARTMENT OF<br>STATE ("DOS"); | |
| THE UNITED STATES DEPARTMENT OF<br>EDUCATION ("DOE"); | |
| And | |
| THE UNITED STATES OF AMERICA. | |
| Defendants. | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DEMAND
## FOR JURY TRIAL

### INTRODUCTION

1. This putative class action challenges the U.S. Department of Homeland Security's ("DHS") decision to set the SEVIS record and Form I-20 of Plaintiffs (and the putative class members they represent) to terminated status for failing to maintain status in relation to their prior enrollment at the University of Farmington ("UF").

2. DHS set them to terminated status based on a blanket determination that students who had enrolled at the University of Farmington would be set to terminated status and designated as "failing to maintain status".

3. Plaintiffs entered the United States on valid student visas to obtain an education in this country. While in the United States, Plaintiffs researched graduate programs that would allow them to further their education in the United States and were approached by acquaintances who recommended University of Farmington, a university accredited by the Accrediting Commission of Career Schools and Colleges ("ACCSC"), listed as a bona fide school by Michigan's Department of Education, and approved by the Department of Homeland Security for participation in the student visa program.

4. University of Farmington attracted foreign students by promoting its offering of graduate programs that allowed students to continue their practical education in the United States through authorized work. Specifically, University of Farmington authorized its enrollees to participate in Optional Practical Training ("OPT"), which allows foreign university students on F-1 student visas to work for U.S. businesses as part of their education.

5. Unbeknownst to Plaintiffs, University of Farmington was an elaborate sting operation of the United States of America and its agencies, including but not limited to DHS, the U.S. Department of State ("DOS"), and the U.S. Department of Education ("DOE").

6. Specifically, University of Farmington was established by Immigration and Customs Enforcement ("ICE"), the immigration enforcement branch of DHS. ICE created University of Farmington as part of a sting operation to investigate and prosecute academic brokers and recruiters who ICE believed were likely to commit visa fraud.

7. ICE took extensive measures to make University of Farmington appear to be a *bona fide* private university. ICE obtained official accreditation for University of Farmington, secured its inclusion on the Michigan Department of Education's website as a legitimate school, and listed University of Farmington as DHS-approved for participation in the student-visa program.

8. Upon information and belief, the U.S. Department of Education ("DOE") cooperated and assisted DHS in obtaining accreditation for University of Farmington from ACCSC—a DOE-approved and regulated accrediting agency—despite knowing that the University of Farmington did not qualify for national accreditation.

9. DHS also set up an official ".edu" website with pictures of the school and its students and which prominently advertised its accreditations, and maintained an active online presence on social media. The University of Farmington website included multiple appeals to international students: one page noted that "UF is authorized by the Student and Exchange Visitor Program to admit foreign students" and another page stated that "Located in the heart of the automotive and advanced manufacturing center of Southeast

Michigan, the University of Farmington provides students from throughout the world a unique educational experience. Our dynamic business administration and STEM curriculum allows students to rapidly apply their knowledge; preparing them to succeed in an ever-globalizing economy."



10. University of Farmington was staffed with an active Director of Admissions, "Ali Milani." "Ali Milani" corresponded regularly in the role as "Director of Admissions" with students.

11. University of Farmington designed a curriculum and an online class registration portal that were shared with some of the students. University of Farmington also created a graduation congratulations letter to send to graduating students.

12. Both DHS agents posing as University of Farmington staff and the academic recruiters that DHS worked with repeatedly assured Plaintiffs that University of Farmington (and its offerings) were legitimate and complied with all applicable rules and regulations.

13. Students repeatedly reached out to the "University of Farmington staff" for information about how to take classes, and "University of Farmington staff" reassured them that classes were coming soon and they were meeting applicable rules and regulations.

14. Students attempted to transfer to other universities, but "University of Farmington staff" refused to sign off on their transfer paperwork, so it was not possible for the students to transfer to other universities.

15. ICE shut down University of Farmington in January 2019 and arrested 8 academic brokers for visa fraud and other related offenses.

16. Immediately following these arrests, DHS began terminating the student status of Plaintiffs and all other international students who had enrolled at University of Farmington for failing to maintain status.

17. DHS made this determination without providing Plaintiffs any opportunity to confront adverse evidence against them, or to present evidence of their own. DHS provided Plaintiffs no pre-termination mechanism for contesting DHS's finding that they failed to maintain status by enrolling in University of Farmington.

18. DHS's blanket determination has far-reaching consequences for Plaintiffs and the members of the putative class. They lost their student visas, and the determination makes Plaintiffs ineligible for nearly all future immigration benefits.

19. Upon information and belief, there are around 600 students impacted by DHS's decision to unilaterally terminate their F-1 status and place a notation of failure to maintain status in their records. At the present time, Plaintiffs know the identities of at least 10 former University of Farmington students who have suffered adverse immigration consequences flowing directly from DHS's termination of their F-1 student status.

20. Plaintiffs and class members were highly qualified applicants for master's programs in in-demand technical and engineering degrees. They would have been highly sought after by U.S. employers after their graduation, and competitive and qualified applicants for work visas and permanent resident cards. Many planned to pursue such a career path, and would be permanent residents or holders of work visas today if they had not been victimized by the University of Farmington scheme.

21. While Plaintiffs and the University of Farmington students they seek to represent have suffered a variety of harms, all these harms are traceable to one agency action: DHS's termination of their F-1 student status based upon their enrollment in the University of Farmington and DHS's placement of notations in Plaintiffs' file and/or in DHS computer systems that Plaintiffs and their putative class members were University of Farmington students and therefore failed to maintain status. Plaintiffs thus seek injunctive and declaratory relief to rectify this termination.

## I. JURISDICTION

22. This action arises under the APA, 5 U.S.C. § 701, et seq., and the Declaratory Judgment Act, 28 U.S.C. § 2201, et seq.

23. This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1346, and the United States Constitution.

24. Venue properly vests in this Court pursuant to 28 U.S.C. § 1391(e).

25.  Declaratory relief is appropriate under 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57. 26. Injunctive relief is appropriate under 28 U.S.C. § 2202, 5 U.S.C. § 706, and Federal Rule of Civil Procedure 65.

26. There are no administrative remedies available to Plaintiffs. ICE has determined that Plaintiffs status shall be terminated for their enrollment at University of Farmington for "failing to maintain status", and there is no established mechanism for Plaintiffs to challenge that determination administratively. The U.S. Court of Appeals for the Third

Circuit has held that DHS orders terminating students' nonimmigrant status are final agency actions ripe for judicial review. *Fang v. Dir. ICE*, 935 F.3d 172, 186 (3d Cir. 2019) (Holding regarding the analogous University of Northern New Jersey ("UNNJ") fake university scheme conducted by DHS. DHS set the UNNJ students' SEVIS record and Form I-20 to terminated status due to the recipients' enrollment in the University of Northern New Jersey.)

## II. PARTIES

27. Plaintiff RAJA VADAPALLY is 34 years old and of Indian nationality. He is a current resident of New Jersey and has been since 2017. He enrolled at the University of Farmington in October 2017 to pursue a master's degree in Management Information Systems.

28. He entered the United States in May 2015 on a nonimmigrant F-1 student visa to study at Silicon Valley University. He graduated in August 2016 with a master's in computer science. After graduating, he engaged in lawful employment through the optional practical training program ("OPT") until September 2017. Before his OPT ended, he researched graduate programs in the United States to further his education. He heard about the University of Farmington from friends, and researched it online, where he remembers seeing that it was a fully accredited university that had offered higher education for at least four or five decades. The website stated that classes and degrees would be offered.

29. Mr. Vadapally applied to University of Farmington.

30. After Mr. Vadapally applied, he received an offer of admission signed by Ali Milani on October 1, 2017. Exhibit A, University of Farmington Admission Letter.

31. Mr. Vadapally accepted and enrolled in the Master's of Management Information Systems program at the University.

32. The University subsequently issued invoices totaling $12,500 which Mr. Vadapally paid with the expectation of there being classes and a full educational opportunity. Exhibit B, University of Farmington Tuition Invoice.

33. After he enrolled, he repeatedly called University of Farmington for information about the classes he would take and when they would start. He was first told that classes would start soon. He was subsequently told that there was a special program for second masters' students where you did not take classes right away. This was portrayed and understood by him to be a legitimate and legal educational program for second masters' students. He trusted that if the government was accrediting the program, it must be legitimate. He therefore continued to make requested tuition payments to not violate his agreement with the University.

34. Mr. Vadapally never received the classes, and by the end of 2018, he began working on a F-2 visa application with his wife as his sponsor; receiving this visa would have allowed him to leave University of Farmington while maintaining legal status.

35. On or around January 26, 2019, U.S. Immigration and Customs Enforcement ("ICE") agents showed up at his home and brought him into custody, telling him that he was out of status, and that his status was gone because of his college. He was taken to the Elizabeth, New Jersey immigration detention center, where he met forty or fifty other

Farmington students, all of Indian descent, who had also just been taken into custody. He was released on bond after three days.

36.  He also received a Notice from ICE dated January 29, 2019 stating that his SEVIS "has been set to Terminated status for otherwise failing to maintain status." Exhibit C, ICE Notice to Raja Vadapally.

37. He still has pending deportation and asylum proceedings.

38. Plaintiff SWETHA BACHU is 32 years old and of Indian nationality. She enrolled at the University of Farmington in February 2018 to pursue a master's degree in information technology.

39. She entered the United States in January 2015 on a nonimmigrant F-1 student visa to study at Virginia International University. She graduated in December 2016 with a master's in computer science. After graduating, she engaged in lawful employment through the optional practical training program ("OPT") until February 2018. Before her OPT ended, she researched graduate programs in the United States to further her education. Ms. Bachu's roommate at the time told her about the University of Farmington because it was relatively inexpensive compared to other schools and fully accredited. After researching the University of Farmington online, she reached out to the University to apply. The website stated that classes and degrees would be offered.

40. After researching the University of Farmington online, Ms. Bachu confirmed that the University was fully accredited.

41. Ms. Bachu reached out to the University of Farmington to apply. In response, the Director of Admissions, Ali Milani, e-mailed Ms. Bachu and explained the information that she needed to apply.

42. After Ms. Bachu applied, she received an offer of admission signed by Ali Milani on January 23, 2018 for her degree of choice, a Master's in Information Technology.

43. Ms. Bachu accepted and enrolled in the Master's of Information Technology program at the University.

44. The University subsequently issued invoices totaling $10,000 which Ms. Bachu paid with the expectation of there being classes and a full educational opportunity.

45. After enrolling in the University, she was directed by the University through e-mail to a student portal to select her classes. However, after enrolling in the classes, she never received any information on how to attend them.

46. Ms. Bachu made repeated attempts to contact the University to ask about classes, but she was unable to get a hold of any one. Although she was confused, she thought it might be normal to not attend classes immediately since she was pursuing her second master's degree. She therefore continued to make requested tuition payments to not violate her agreement with the University.

47. Ms. Bachu never received the classes, and by the end of 2018, she started researching other universities in order to transfer.

48. On December 31, 2019, at 4am, U.S. Immigration and Customs Enforcement ("ICE") agents showed up at her home and brought her into custody, claiming that she had violated her visa status based on her enrollment in University of Farmington. After spending forty-five days in immigration detention, she was granted voluntary departure back to India.

49. She also received a Notice to Appear from the Department of Homeland Security stating that she was subject to removal on the basis that she "failed to maintain or comply with

the conditions of the nonimmigrant status under which you were admitted." Exhibit D, Swetha Bachu Notice to Appear.

50. Plaintiff PRUDHIVI RAJ GUNDABATHULA is 32 years old and of Indian nationality. He enrolled at the University of Farmington on September 25, 2017 to pursue a master's degree in computer science.

51. He first entered the United States in May 2015 on a nonimmigrant F-1 student visa to study at Northwestern Polytechnic University. He graduated in October 2016 with a master's in computer science. After graduating, he engaged in lawful employment through the optional practical training program ("OPT") until September 2017. Before his OPT ended, he researched graduate programs in the United States to further his education. An acquaintance, Bharath Kakireddy, told him about University of Farmington and recommended it to him since it was relatively inexpensive compared to other schools and fully accredited. Mr. Kakireddy *never* mentioned that the school did not provide any classes.

52. After researching the University online, and noting that it had been around for a significant amount of time, Mr. Gundabathula decided to apply. Mr. Kakireddy told Mr. Gundabathula that Mr. Kakireddy was helping the University and that he would assist him with the application process. Mr. Gundabathula sent the documents he needed to apply directly to Mr. Kakireddy. At *no* time did Mr. Kakireddy, or any University employee, explain that no classes would be offered, or mention that the University was not legitimate.

53. After submitting the requested information, Mr. Gundabathula received a Letter of Admission and a Form I-20, Certificate of Eligibility for Nonimmigrant Student Status, from the University of Farmington.  He also received an invoice for the issuance of the I-20 and tuition for the Fall Term 2017 totaling $2500, which he paid with the expectation of there being classes and a full educational opportunity.

54. After enrolling at the University, he never received any information on how to attend classes. Although he thought it was strange, he thought perhaps it was normal since he was pursuing his second master's degree. He never suspected it was illegal, and continued to pay requested tuition payments with the expectation that classes would eventually start. He paid around $10,000 in tuition fees to the University.

55. On or about January 8, 2019, DHS agent Anthony Wick came to Mr. Gundabathula's home in West Des Moines, Iowa. The agent told him that the University was fake and that he had to leave the country within three days. Mr. Gundabathula immediately reached out to Ali Milani, the Director of Admissions at the University, to clarify the situation and contacted an immigration attorney. In response, Mr. Milani assured him that his status was valid and sent him a new I-20 to present as proof. Mr. Milani never mentioned that the University was not legitimate. His  attorney also contacted Mr. Wick and was informed that his SEVIS status was valid.

56. On the advice of his attorney, he also went to visit the University of Farmington campus to confirm that it was legitimate. During his visit, he met with Mr. Milani who again assured him that everything was in order. He also asked Mr. Milani if he would be willing to speak with his attorney. Mr. Milani strongly opposed speaking with his attorney. Mr. Milani told him that there was no need to contact an attorney because the University was legitimate.

57. After this interaction, and on advice from his attorney, he decided to transfer and applied to New England College. On January 21, 2019, he emailed the University and requested that his SEVIS be transferred. On January 25, 2019, when the University still had not transferred his SEVIS, he reached out by email to request the transfer again, copying his attorney on the email. The University responded by stating that they were unable to transfer his SEVIS until January 30, 2019 because the University was opening various satellite campuses throughout the U.S.

58. On January 29, 2019, he found out that the University of Farmington was a fake University, and his SEVIS and F-I student visa was terminated based on his enrollment in the University of Farmington. On the advice of his attorney, he traveled back to India on February 4, 2019.

59. He also received a Notice from ICE dated January 29, 2019 stating that his SEVIS "has been set to Terminated status for otherwise failing to maintain status." Exhibit E, ICE Notice to Prudhivi Raj Gundabathula.

60. Plaintiff RAJASEKHAR REDDY PASAM is 31 years old and of Indian nationality. He enrolled at the University of Farmington in October 2017 to pursue a master's degree in computer science.

61. He entered the United States in August 2015 on a nonimmigrant F-1 student visa to study at Northwestern Polytechnic University. He graduated in August 2016 with a master's in computer science. After graduating, he engaged in lawful employment through the optional practical training program ("OPT") until October 2017. Before his OPT ended, he researched graduate programs in the United States to further his education. He learned from a couple of friends about University of Farmington, and he called the University of Farmington to inquire about the application process. The University of Farmington told him to email his application and supporting documents such as a copy of his visa and transcripts from Northwestern Polytechnic University. The University of Farmington *never* mentioned that the school was fake or that it did not provide any classes.

62. After submitting the requested information, he received a Letter of Admission and Form I-20, Certificate of Eligibility for Nonimmigrant Student Status, from the University of Farmington. He also received an invoice for the issuance of the I-20 and tuition for the Fall Term 2017 totaling $2500, which he paid with the expectation of there being classes and a full educational opportunity.

63. After enrolling at the University of Farmington, he never received any information on how to attend classes. After a couple weeks of not hearing anything, he reached out to the University of Farmington and asked them what was going on. The University told him that classes would start soon and that they were waiting for a couple more students to enroll before starting. One month later, when he still had not received any information about the classes, he called the University again, but no one answered. He reached out again a couple of weeks later and received the same response as he did the first time. With the expectation that classes would eventually start as promised, he continued to make any requested tuition payments. He paid around $10,000 in tuition fees to the University.

64. However, when classes had still not started in November 2018, he decided to transfer and was admitted at New England College. He reached out to the University of Farmington and explained that he wanted to transfer and that they needed to transfer his SEVIS. However, the University of Farmington never responded. Over the next couple weeks, he

made repeated calls to the University of Farmington without being able to get a hold of them.

65. On January 29, 2019, when he was away from home, his friend told him that ICE agents had showed up at his address and that the University was fake. He immediately contacted SEVIS and they verified that his status and F-I student visa were terminated based on his enrollment in University of Farmington. After this, he left the United States.

66. He also received an email from the US Consulate General of Hyberbad, India on June 18, 2019 stating that, "the non-immigrant U.S. visa which you currently hold has been revoked in accordance with the United States Immigration and Nationality Act". Exhibit F, US Consulate General Email to Rajasekhar Reddy Pasam.

67. Defendant PATRICK LECHLEITNER is the Director of Immigration and Customs Enforcement ("ICE"). In this capacity, he is responsible for all ICE enforcement operations and the administration of the Student Exchange Visitor Program. He is ultimately responsible for the operation related to University of Farmington and the decision to terminate Plaintiffs' SEVIS records and I-20s for their enrollment in University of Farmington. Mr. Lechleitner is sued in his official capacity.

68. Defendant UR MENDOZA JADDOU is the Senior Official Performing the Duties of the Director of U.S. Citizenship and Immigration Services, the agency within DHS responsible for adjudicating visa petitions and most other applications for immigration benefits. Ms. Jaddou is sued in her official capacity.

69. Defendant ALEJANDRO MAYORKAS is Secretary of the Department of Homeland Security and heads the Department of Homeland Security. ICE and USCIS are subdivisions of DHS. As Secretary of Homeland Security, Mr. Mayorkas is ultimately responsible for all actions taken by DHS's sub-agencies. Mr. Mayorkas is sued in his official capacity.

70. Defendant UNITED STATES DEPARTMENT OF HOMELAND SECURITY is a department of the executive branch of the U.S. government and is a cabinet-level agency within the meaning of 5 U.S.C. § 552(f)(1). It oversees the operations of ICE and USCIS. DHS is ultimately responsible for the creation and operation of the University of Farmington, the termination of the Plaintiffs' F-1 student status.

71. Defendant UNITED STATES DEPARTMENT OF STATE is an executive branch agency of the U.S. government and is a cabinet-level agency within the meaning of 5 U.S.C. § 552(f)(1). DOS is the federal agency responsible for overseeing, monitoring, issuing, and allocating immigrant and non-immigrant visas, including F-1 student visas.

72. Defendant UNITED STATES DEPARTMENT OF EDUCATION is a department of the executive branch of the U.S. government and is a cabinet-level agency within the meaning of 5 U.S.C. § 552(f)(1). DOE is responsible for establishing, administering, and executing executive policies regarding education in the United States. DOE is also responsible for approving accrediting agencies that are reliable authorities on the quality of education and training provided by institutions of higher education. DOE publishes a list of these nationally recognized accrediting agencies. The University of Farmington was accredited by the Accrediting Commission of Career Schools and Colleges ("ACCSC"), a U.S. Department of Education-recognized accrediting institution.

73. Defendant UNITED STATES OF AMERICA is a sovereign sued under the Administrative Procedure Act ("APA"), under which the United States has waived its sovereign immunity in suits brought by parties who have suffered a legal wrong because

of, or who have been adversely affected or aggrieved by, a federal agency action. See 5 U.S.C. § 702. Defendant United States of America includes all government agencies and departments responsible for and involved in the University of Farmington, and all related investigations and actions.

## III. STATEMENT OF FACTS

### Regulatory Framework

74. Congress authorized student status for foreign nationals who enroll in Government-approved academic institutions. 8 U.S.C. § 1101(a)(15)(F).

75. Under this statute, the foreign national students enter the United States on F-1 visas to study in the United States.

76. ICE is responsible for administering the F-1 student visa program and does so through a program entitled Student and Exchange Visitor Program. ("SEVP").

77. To sponsor a student's F-1 status, a school must obtain formal approval from DHS. This process is rigorous.

78. The school must first file an application for School Certification on Form I-17 through the Student and Exchange Visitor Information System ("SEVIS").

79. SEVIS is a SEVP-managed Internet based system to track and monitor schools and foreign students in the United States. 8 C.F.R. § 214.3.

80. On the application, a school must submit to DHS detailed information on its programs of study. This includes accreditation and recognitions; information on its calendar, costs, and demographics; the locations of its campuses and instructional sites; and information for responsible school officials. Supporting evidence must be submitted with the application. In order to obtain DHS approval, universities must provide proof of accreditation from a U.S. Department of Education-recognized accrediting agency.

81. If approved, the school must submit to periodic recertification. This recertification may be denied for a host of reasons, including a school's failure to operate as a bona fide institution of learning. 8 C.F.R. § 214.4(a)(2).

82. The recertification may also be denied for the school's failure to employ adequate qualified professional personnel. *Id.*

83. The recertification may also be denied for failure to maintain proper facilities for instruction. *Id*.

84. When a school's certification is terminated for failure to meet requirements, ICE maintains a policy and practice of allowing students to transfer to other schools or change status before ICE terminates their status and SEVIS record. ICE provides such students with at least one month of notice, which allows the students an opportunity to preserve their valid F-1 status.

85. ICE regulations delegate considerable oversight authority to Designated School Officials ("DSOs").

86. DSOs are school employees named by a school's head and approved by ICE to monitor, advise, and oversee F-1 students enrolled at the school. 8 C.F.R. § 214.3(I)(l).

87. DSOs maintain active SEVIS records for the entirety of the duration of a student's enrollment. This includes registering a student's participation in OPT with ICE. It also includes approving or requesting approval for benefits such as employment or a reduced

course load. The DSOs provide students with information to make informed decisions regarding maintaining their student status. This includes counseling students on the number of hours allowed for work, the type of employment that is allowed, and the student's requirement to maintain F-1 status. *See, e.g.,* 8 C.F.R. § 214.2(f)(6)(iii), 9(ii)(D), (10)(i); 214.3(g).

88. According to the agency's manual for DSOs, "The DSO serves as a link between nonimmigrant students and SEVP and plays a central role in ensuring the nonimmigrant students at their school maintain status while in the United States." *Student and Exchange Visitor Program: Training for Designated School Officials*, ("DSO Manual"), *available at* https://www.ice.gov/doclib/sevis/pdf/SEVP_DSO_Training.pdf.

89. The manual also states, ". . . .there are a number of responsibilities for nonimmigrant students to keep in mind. When one also considers that many of these students are in an unfamiliar culture, and perhaps struggling to become more fluent in English, the role of the DSO becomes more critical in assisting the student to maintain his/her nonimmigrant status." *Id* at 15.

90. The DSOs should "counsel nonimmigrant students in ways that remind them of their responsibilities and allow them to maintain their nonimmigrant status." *Id*.

91. The DSOs are responsible for "carefully attending to the details of the information and the student's record . . . to alert the student to issues that might jeopardize their nonimmigrant status or make it difficult for them to re-enter the United States to continue their studies." *Id*. at 14.

92. A school's DSO is responsible for certifying what counts as a full course of study. 8 C.F.R. § 214.2(f)(6)(i)(A)-(B).

93. Students with F-1 status are issued Form I-20 by the ICE-approved school the student will attend. 8 C.F.R. § 214.2(f)(1)(i)(A).

94. A student with F-1 status who transfers between schools is allowed to remain in the U.S. while transferring as long as the student will begin classes at the new school within five months of transferring. 8 C.F.R. § 214.2(f)(8)(i).

95. Students with F-1 status can participate in practical training, which is authorized work. 8 C.F.R. § 214.2(f)(10).

96. There are two types of practical training: Optional Practical Training ("OPT") and Curricular Practical Training ("CPT").

97. Both of these options allow for a student to gain meaningful employment while they are on a F-1 student visa. 8 C.F.R. § 214.2(f)(10).

98. OPT is temporary employment separate from a student's curricular requirements that is directly related to the student's major area of study. 8 C.F.R. § 214.2(f)(10)(ii)(A).

99. Students may engage in authorized OPT during school breaks or when school is otherwise not in session . . . or after completion of a course of study. 8 C.F.R. § 214.2(f)(10)(ii)(A)(1)-(3).

100. Training undertaken before a course of study is completed is commonly known as "pre-completion OPT" while training after the course of study has been completed is known as "post-completion OPT." 8 C.F.R. § 214.2(f)(10)(C).

101.     OPT is generally available for up to 12 months, but students with science, technology, engineering, or mathematics degrees may obtain a 24-month extension beyond the initial 12 months of post-completion OPT. 8 C.F.R. § 214.2(f)(10)(C).

102.     A student who fails to maintain a full course of study or otherwise has his or her F-1 student status terminated may apply for reinstatement. 8 C.F.R. § 214.2(f)(16)(i).

### University of Farmington – An ICE Sting Operation

103.     The University of Farmington was a sting operation created by ICE targeting brokers and recruiters who prey on foreign students seeking to maintain the F-1 visa status. These brokers steer students to enroll in schools whose principal objective is not to provide *bona fide* academic programs, but to enrich their proprietors through substantial fees and tuition while offering students no meaningful educational opportunities.

104.     Although these brokers are typically aware that the schools are operating improperly, they often abuse students' trust and mislead them into believing that the schools are operating lawfully by facilitating practical training through the F-1 program. The brokers exploit the fact that in many countries, prospective students routinely engage brokers to guide them through the process of selecting and enrolling in universities and colleges. The brokers take advantage of widespread misinformation concerning the F-1 program and the complexity of the program's rules to convince their clients that the school's offerings are legitimate.

105.     By all outside appearances, the University of Farmington was a legitimate educational institution. The University of Farmington marketed itself as a university that "provide[s] students from throughout the world a unique educational experience" and was accredited by the Michigan Department of Licensing and Regulatory Affairs and the Accrediting Commission of Career Schools and Colleges. Farmington created what appeared to be a legitimate web presence through its website and Twitter. The website went so far as to have bad weather alerts for students. Ultimately, there was no reason for a student applying to know or have a suspicion that Farmington was a fake university.

106.     The students were assured by the promises of the brokers and the University of Farmington staff that they could continue to work in the U.S. through OPT without the immediate need to attend classes at the University of Farmington. Some students were told that the classes were currently full; others enrolled in classes through a student portal online; others were told that the school would soon offer classes online. Through these and other representations, the students were assured that the University of Farmington's offer of OPT to students on enrollment was consistent with the applicable regulations governing the practical training of the F-1 visa program.

107.     Upon information and belief, the University of Farmington designated Ali Milani Carrie Fernand as its Principal DSO.

108.     In January 2019, ICE began terminating the SEVIS records and I-20s for each of the more than 600 noncitizens who had enrolled at University of Farmington. Specifically, ICE made a blanket finding that all noncitizen enrollees of University of Farmington should have their visa status terminated and had failed to maintain status. ICE did not provide students with an individualized hearing or any meaningful opportunity to contest its determinations.

109.    Contrary to its established practice and policy, ICE did not provide these students with any advance notice that the school's SEVIS designation would be terminated, nor any opportunity to transfer to another school or apply for a change of status before their SEVIS records were terminated. In fact, "University of Farmington officials", who were really ICE agents, refused to process the transfer requests that students made prior to the termination of their status.

110.    ICE sent many of the students letters stating their SEVIS record and FORM 1-20 had been set to Terminated Status for failing to maintain status in relation to their prior enrollment at the University of Farmington. Many of these letters were dated on or around January 29, 2019.

111.    ICE placed many of the students in removal proceedings in Immigration Court by issuing them Notices to Appear ("NTAs") which charged them with being removable from the United States under 8 U.S.C. § 1227(a)(1)(C)(i) for failure to maintain or comply with the conditions of the nonimmigrant status under which they were admitted.

### Immigration Consequences of a Failure to Maintain Status Notation

112.    An official finding that a noncitizen has failed to maintain status comes with significant consequences; the noncitizen loses their visa, becomes out of status, becomes deportable, and is not eligible to adjust to a different status before they leave the country.

113.    Section 237(a)(1)(C) of the Immigration and Nationality Act ("INA"), 8 U.S.C. 1227(a)(1)(C), states that "Any alien who was admitted as a nonimmigrant and who has failed to maintain the nonimmigrant status in which the alien was admitted or to which it was changed under section 1258 of this title, or to comply with the conditions of any such status, is deportable." § 1227(a)(1)(C).

114.    Section 245(c) of the Immigration and Nationality Act ("INA"), 8 U.S.C. 1255(c), states that adjustment of status to that of a person admitted for permanent residence "shall not be applicable to… an alien… who has failed (other than through no fault of his own or for technical reasons) to maintain continuously a lawful status since entry into the United States". § 1255(c).

115.    Furthermore, from the date that the noncitizen receives notice that they are out of status for failure to maintain status, the noncitizen begins to accrue unlawful presence. An alien who is unlawfully present in the United States for more than 180 days, becomes inadmissible to the United States for three years. 8 U.S.C. 1182(a)(9)(B)(i)(I). An alien who is unlawfully present in the United States for one year or more, becomes inadmissible to the United States for ten years.  8 U.S.C. 1182(a)(9)(B)(i)(II).

116.    However, note that if a noncitizen found *just* to have failed to maintain status, without a fraud notation on their file, leaves the United States before accruing over 180 days of unlawful presence, they are not inadmissible to the United States under the Immigration and Nationality Act. Once they leave the United States, they are not legally barred from applying and receiving new visas, permanent residence status, or naturalization, nor are they barred from entry.

117.    Based on ICE's blanket finding that every noncitizen who enrolled in University of Farmington had failed to maintain status, Plaintiffs and all others who enrolled at University of Farmington suffered the immigration consequences of losing their current

visas, becoming out of status, becoming deportable, losing eligibility to adjust to a different status before leaving the United States, and beginning to accrue unlawful presence that could lead to inadmissibility penalties.

118.     However, University of Farmington students have collectively experienced a pattern of further immigration consequences that cannot be explained by the failure to maintain status notation on their files. Farmington enrollees, who never accrued more than 180 days of unlawful presence, are being treated as permanently and forever barred from admission or entry to the United States, and as ineligible to receive visas or permanent residence status. Several Farmington enrollees report that they voluntarily departed quickly after receiving their out of status notice, attempted to apply for new visas from back in India, and were denied visas or entry after experiencing irregularities in their application process.

119.     For example, in January 2019, Shiva Teja Dachepally was marked as out of status for failure to maintain status for having previously been enrolled at Farmington University. He voluntarily returned to India in February 2019. He then applied for a new H1-B visa, and was at first approved in September 2019. However, in December 2019, when he traveled to the United States, border control agents at the airport denied him entry and stated it was because he was enrolled at the Farmington fake university. Upon information and belief, this indicates that the record of his previous Farmington enrollment was treated as a "stealth fraud notation" in the ICE database, i.e. that the notation in the ICE database that he enrolled at Farmington University was treated as a fraud notation; he was treated as inadmissible under 8 USC 1182(6)(C), which bars aliens who have procured a visa or sought to procure a visa "by fraud or willfully misrepresenting a material fact". § 1182(a).

120.     An official finding that a noncitizen has knowingly participated in visa fraud comes with far-ranging consequences, making such an individual ineligible for nearly all immigration benefits.

121.      Section 212(a)(6)(C)(i) of the Immigration and Nationality Act ("INA"), 8 U.S.C. 1182(a)(6)(C)(i), states that any "alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit under the chapter is inadmissible." Such individuals "are ineligible to receive visas and ineligible to be admitted to the United States." § 1182(a). Any such individual in the United States is ineligible to adjust their status and become a lawful permanent resident (i.e. a "green card" holder). *Id*. § 1255(a).

122.     While Farmington students have never been notified of a finding of fraud against them, the pattern of Farmington students being denied entry, admission, and visas in connection to their prior Farmington enrollment, is explained by ICE treating Farmington enrollment as a stealth blanket fraud finding in their files.

123.     ICE previously received legal scrutiny for formally notating fraud findings to international students who enrolled at University of Northern New Jersey, a similar fake university scheme conducted by DHS. *Fang v. Dir. ICE*, 935 F.3d 172, 186 (3d Cir. 2019). Upon information and belief, in an attempt to avoid legal scrutiny of their actions

in the University of Farmington scheme, ICE has failed to notice Farmington students of a fraud finding against them, but has treated them as if they have a fraud notation.

124. ICE's stealth blanket fraud finding thus renders all Farmington enrollees *permanently* and *forever* barred from permanent admission to the United States, subject only to a narrow discretionary waiver available only to individuals with a spouse or parent who is a U.S. citizen or lawful permanent resident *and* who would suffer *extreme hardship* if the discretionary waiver were not granted from the Government. *See id*. §§ 1182(d)(3); 1182(i).

125. U.S. consulates in India deny or delay the visa applications of the former University of Farmington enrollees based on their inadmissibility under § 1182(a)(6)(C)(i). Based on ICE's stealth treatment of every noncitizen who enrolled in University of Farmington as having knowingly participated in visa fraud, none of the Plaintiffs or others who enrolled at University of Farmington will ever be able to receive any immigration benefits in the future without applying for a discretionary waiver for which they may not be eligible. They have essentially been blacklisted at all levels of the U.S. immigration system with no way to meaningfully challenge ICE's stealth treatment of them as having knowingly committed visa fraud.

126. Many of the enrollees planned to apply for work visas or permanent residence after they completed their master's degree programs in in-demand fields like technology, science, and engineering. There is a high demand amongst U.S. employers for their skill sets; if it were not for the blacklisting of University of Farmington enrollees, today many would be work visa holders or permanent residents.

## IV. CLASS ALLEGATIONS

127. Plaintiffs bring this action as a class action on behalf of themselves and all similarly situated pursuant to Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure. The class consists of the following ascertainable members:

> All persons enrolled at University of Farmington as nonimmigrants in F-1 status at any time and who had their lawful status terminated based on DHS's determination of them failing to maintain status.

128. The precise number of noncitizens who fall within the class definition is known only to Defendants, but based on public statements by the Government, the class likely consists of approximately 600 foreign students, making joinder of all members impracticable.

129. A community of interest exists between the named Plaintiffs and members of the class in that there are questions of law and fact that are common to all Plaintiffs and class members. Plaintiffs and the class members they seek to represent challenge DHS's decisions terminating their lawful nonimmigrant status based on a blanket determination that students enrolled in University of Farmington were failing to maintain status.

130. The claims or defenses of the representative Plaintiffs and of Defendants are typical of the claims or defenses of the class. Although Plaintiffs are in different immigration-related procedural situations, they all challenge the same unlawful decision

by Defendants to terminate their F-1 student status in relation to their enrollment at University of Farmington.

131.    The named Plaintiffs will fairly and adequately protect the interests of the class because they, like all class members, are subject to the same unlawful termination of their visa status based on their enrollment at University of Farmington.

132.    Individual suits by each member of the class would be impracticable because they would create a risk of inconsistent adjudications and would establish incompatible standards of conduct for the parties opposing the class.

133.    The number of individual suits would impose an undue burden on the courts as it would require the adjudication of potentially hundreds of lawsuits.

## V. CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## VIOLATION OF THE FIFTH AMENDMENT OF THE U.S. CONSTITUTION— FAILURE TO PROVIDE PROCEDURAL DUE PROCESS

134.    Plaintiffs incorporate paragraphs 1 to 133 as if fully stated herein.

135.    DHS's unilateral termination of Plaintiffs' F-1 status and finding that they had failed to maintain status based on their enrollment in UF were not accompanied by constitutionally adequate procedural  protections and thus violated Plaintiffs' due process rights.

136.    DHS unilaterally terminated Plaintiffs' F-1 status based on its blanket determination  that Plaintiffs failed to maintain status simply by enrolling in UF.

137.    DHS made this determination across-the-board for *every* person who enrolled at UF, without providing notice of the alleged conduct or any individualized hearing to dispute the determination *before* DHS terminated their F-1 status and made a corresponding finding that they had failed to maintain status.

138.    DHS's conduct violated procedural due process by: (i) failing to provide Plaintiffs with an individualized hearing before an impartial adjudicator before determining that Plaintiffs failed to maintain status; (ii) failing to provide Plaintiffs with adverse evidence and an  opportunity to confront and respond to such evidence; (iii) failing to provide Plaintiffs with an  opportunity to present evidence on their own behalf; and (iv) failing to make any individualized  determination of any kind with respect to Plaintiffs' conduct before terminating Plaintiffs' F-1 status  for their "failure to maintain status".

139.    Rather than comply with these well-established due process requirements, DHS made a blanket determination that any student who ever enrolled at UF had failed to maintain status, regardless of the facts surrounding each person's individualized circumstances, and terminated the  students' F-1 status based on this determination.

140.    DHS's refusal to consider Plaintiffs' individual circumstances, and its termination of Plaintiffs' F-1 status based upon a blanket, indiscriminate determination that every noncitizen who enrolled in UF failed to maintain status, violated Plaintiffs' procedural due process rights.

**SECOND CAUSE OF ACTION**

**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT—ARBITRARY AND CAPRICIOUS AGENCY ACTION: UNLAWFUL TERMINATION OF F-1 STATUS**

141. Plaintiffs incorporate paragraphs 1 to 140 as if fully stated herein.

142. DHS's termination of Plaintiffs' F-1 students status, and its corresponding determination that Plaintiffs failed to maintain status, violates the APA and should be set aside pursuant to 5 U.S.C. § 706(2)(A) as arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law.

143. DHS terminated Plaintiff's F-1 status and stated they had failed to maintain status based on Plaintiff's enrollment in the University of Farmington. In making these findings, the agency did not consider any facts relevant to Plaintiff's circumstances. DHS provided no explanation whatsoever, let alone a reasoned explanation, justifying this determination.

144. Rather than considering relevant facts specific to each student, DHS merely predetermined as a *fait accompli* that any student who ever enrolled in University of Farmington would be subject to termination of F-1 status.

145. The agency's wholesale failure to consider facts relevant to individual students, and its failure to provide any reasoned explanation for its termination of 401 status, *before* the termination of 4-1 status, was arbitrary and capricious and in violation of the APA.

146. DHS's termination decisions were also arbitrary and capricious because DHS departed from an established practice without a reasoned explanation.

147. DHS has maintained a practice and policy of affording students enrolled in institutions facing termination of SEVP certification with notice and an opportunity to seek transfer to another DHS-certified institution, to change their status, or to depart the United States *before* being considered "out of status."

148. DHS departed from this practice and policy in Plaintiffs' case; the agency terminated Plaintiffs' F-1 status in SEVIS without providing Plaintiffs advance notice or an opportunity to maintain valid nonimmigrant status by transferring schools or apply to change to a different nonimmigrant status. This unexplained departure from past agency policy and practice violated the APA.

149. Finally, DHS's termination decisions were arbitrary and capricious because the agency lacked statutory or regulatory authority to unilaterally terminate Plaintiffs' F-1 status under the circumstances presented.

150. DHS has regulatory authorization to terminate F-1 status when (i) a waiver DHS previously authorized under INA § 212(d)(3) or (4) is revoked; (ii) a private bill is introduced to confer permanent resident status; or (iii) official notice is published in the Federal Register on the basis of national security, diplomatic, or public safety reasons. 8 C.F.R. § 214.1(d). DHS's decisions terminating Plaintiff's F-1 status were based on none of these enumerated criteria.

151. Enrollment in the University of Farmington is not a valid reason for terminating a student's F-1 status or SEVIS record. *Id.*; *see also Terminate a Student*, Dep't of

Homeland Security, https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-terminations/terminate-a-student (last visited March 15, 2023). The final DHS decisions terminating Plaintiffs' F-1 status cited no statute, regulation, or even sub-regulatory guidance purporting to authorize ICE to terminate a student's F-1 status for enrollment in the University of Farmington.

152. In any event, termination was improper because Plaintiffs complied with every rule and regulation governing the F-1 visa program in enrolling in UF. The University of Farmington was DHS-certified to sponsor students in F-1 status; University of Farmington's DSO certified Plaintiffs' participation in facially valid OPT programs; and Plaintiffs obtained facially valid Forms 1-20 conforming the validity of their F-1 status and authorization to work in OPT. UF advertised, promised, and contracted to provide classes to Plaintiffs, and Plaintiffs intended and wanted to pursue a full course of study.

153. Plaintiffs properly maintained their status throughout their enrollment in University of Farmington, and it was only DHS's unilateral termination of their F-1 status, based upon its finding that students failed to maintain status, that caused Plaintiffs to become out of status. Furthermore, it was DHS's unilateral failure to provide the advertised, promised, and contracted classes to Plaintiffs that prevented them from pursuing a full course of study. It was DHS's unilateral failure to sign off on transfer paperwork that prevented Plaintiffs and class members from transferring to universities where they could pursue a full course of study.

154. DHS's termination of Plaintiff's F-1 status should thus be set aside as arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law.

## THIRD CAUSE OF ACTION
## ESTOPPEL

155. Plaintiffs incorporate paragraphs 1 through 154 as if fully stated herein.

156. Defendant United States of America and all of its agencies and officers—including but not limited to Defendants DHS, DOS, and DOE and their respective agents—knowingly lied to Plaintiffs and intentionally engaged in the following affirmative misconduct:

(1) established and operated UF as a "university" without any intention of providing any bona fide education;

(2) obtained third-party certifications, accreditations, and recognitions for UF despite knowing that UF was not a bona fide educational institution;

(3) advertised these accreditations on UF website and elsewhere knowing that UF did not qualify for these accreditations;

(4) listed UF as an institution certified by DHS for participation in the student visa program knowing that UF did not qualify for such participation;

(5) used brokers to assist F-1 students in enrolling in UF despite:

    a. knowing that F-1 students are a vulnerable population due to language barriers, cultural differences, and the complexity of the F-1 program;

    b. that these brokers engaged in illegal practices;

    c. that the brokers were actively preying on and defrauding students;

    d. that the brokers knew that UF was not a legitimate institution of higher learning; and

    e. that these brokers received financial kickbacks from UF, funded with money the students paid.

(6) enrolled Plaintiffs in UF, issued them acceptance letters, collected tuition payments, sent curriculum and course registration online portals to students, and otherwise represented UF to students as a legitimate school, all the while knowing that the school was a sham;

(7) included UF as an active participant in ICE's SEVIS system, issued Plaintiffs facially valid Forms I-20, and processed their enrollment and school transfers;

(8) maintained an active website, social media presence, and physical presence calculated to give the appearance that UF was established and operating as a genuine university;

(9) appointed agency officers to pose as faculty, staff, and employees of UF;

(10)     instructed agency officers posed as faculty, staff, and employees of UF to interact with students via phone, email, letters, and in person and answer their questions regarding enrollment in UF  and attending classes;

(11)     approved Plaintiffs for OPT and granted them permission to work immediately upon enrollment;

(12)     assured Plaintiffs that the OPT and work authorization UF awarded them was lawful and permitted under governing regulations and rules;

(13)     assured Plaintiffs that their enrollment in UF and authorized work under OPT would not adversely affect their lawful status in the United States;

(14)     communicated directly with Plaintiffs in a manner that intentionally gave the false impression that their enrollment in UF would not adversely affect their lawful status in the United States;

(15)     accepted millions of dollars in unrefunded fees from students for "tuition" with the knowledge that UF was not a genuine educational institution;

(16)     required former UF enrollees to submit documents related to UF in support of their applications for immigration benefits in order to entrap the enrollees, deny them the immigration benefit sought, and render them ineligible for future immigration benefits;

(17)     assured students that classes would be offered before they enrolled; after enrollment, assured students that classes would be available for registration soon, and/or that it was normal not to take classes yet in their specific master programs, and that this was lawful and permitted under governing regulations and rules.

(18)   refused to grant students' transfer to the other universities they had been accepted to, blocking the students from receiving a real education at a legitimate university.

157.   In enrolling at UF, Plaintiffs relied on these intentional misrepresentations and fell victim to this intentional misconduct to their substantial detriment.

158.   Defendant United States of America and all of its agencies and officers—including but not limited to Defendants DHS, DOS, and DOE and their respective agents—should be equitably estopped from relying on Plaintiffs' enrollment in UF as a basis for denying them or revoking any immigrant benefit.

## VII. ATTORNEYS' FEES

159.   The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

160.   As a result of Defendants' unlawful actions, Plaintiffs were required to retain legal counsel and to pay counsel reasonable attorneys' fees.

161.   Plaintiffs qualify for fees, expenses, and costs under the Equal Access to Justice Act.

162.   Pursuant to the Equal Access to Justice Act ("EAJA"), 5 U.S.C. § 504 and 28 U.S.C. § 2412, Plaintiffs are entitled to recover their costs, expenses, and fees because the Defendants' actions are not and have not been substantially justified.

## VIII. REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and:

a. Certify this action as a class action and award all relief granted to the class as a whole;

b. Declare that DHS's termination of Plaintiffs' F-1 student status based on their enrollment in the University of Farmington violated Plaintiffs' Fifth Amendment due process rights; violated the APA, and was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance of the law;

c. Vacate DHS's decisions terminating Plaintiffs' F-1 student status;

d. Order Defendants to provide Plaintiffs and class members their choice of (1) a reasonable opportunity to preserve their valid status by transferring to a different DHS-approved school, or (2) an H-1B visa after providing a reasonable opportunity for the Plaintiff or class member to find a qualifying employer sponsor, or (3) an H-2B visa after providing a reasonable opportunity for the Plaintiff or class member to find a qualifying employer sponsor, or (4) a permanent resident card.

e. Order Defendants to permanently remove from all U.S. Government records all information arising from or relating to any University of Farmington enrollee's enrollment in the University of Farmington, including but not limited to any notation, finding, or charge of failure to maintain status;

f. Order Defendants to reopen and re-adjudicate any immigration benefit or application sought by any University of Farmington enrollee without regard to enrollment in University of Farmington or any matters relating to or arising from that enrollment;

g. Declare that Defendant United States of America and all of its agencies—including but not limited to Defendants DHS, ICE, USCIS, and DOS—are estopped from

relying on Plaintiffs' enrollment in University of Farmington or any matters arising from or relating to that enrollment as a basis to:

    i.   find that Plaintiffs failed to maintain their nonimmigrant status

    ii.  find that Plaintiffs committed fraud or made material misrepresentations

    iii.  deny or revoke any application for immigration benefits or relief

    iv.  deny Plaintiffs admission to the United States;

h.  Enjoin Defendant United States of America and any of its officers, employees, managers and directors, including those at DHS, ICE, USCIS, and DOS, from:

    i.   relying on a Plaintiff or class member's past enrollment in University of Farmington to deny the Plaintiff or class member any immigration-related benefit;

    ii.  posting any annotation in any Government database or record system that Plaintiffs and the class members failed to maintain status, or committed fraud or misrepresentation, in relation to their enrollment at University of Farmington, and requiring that any such existing records be permanently removed;

    iii.  providing, directly or indirectly to any agency of the United States or a foreign government, a statement or electronic transmission that Plaintiffs or class members have failed to maintain status or committed fraud or misrepresentation in relation to their enrollment at University of Farmington;

    iv. relying on any determination related to University of Farmington to deny, revoke, or delay the adjudication of any immigration-related petition or application filed by Plaintiffs or class members;

v.  concluding that any University of Farmington enrollee has accrued unlawful

presence.

## JURY DEMAND UNDER FED. R. CIV. P. 38(b)

Plaintiffs demand a trial by jury of all issues so triable.

Dated: December 31, 2025

*/s/ Anna L. Nathanson, DC # 1737999 \**
*/s/ Amy E. Norris, DC #* 1017140\*
NORRIS LAW, PLLC
616 E Street N.W.
Suite 1156
Washington, DC, 20004
Anna@norrislawgroup.org
Amy@norrislawgroup.org
202-830-1225
Counsel for Plaintiffs

*\*Pro Hac Vice Motion Forthcoming*

/s/Jerard Gonzalez NJ 035621992
BASTARRIKA, SOTO, GONZALEZ & SOMOHANO, LLP
3 Garret Mountain Plaza, Suite 302
Woodland Park, NJ 07424
JGonzalez@bsgslaw.com
(973)354-2483
Counsel for Plaintiffs